UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DIANNE ROMANO,

                Plaintiff(s),                **REPORT AND**
                                       **RECOMMENDATION**
          -against-               CV 07-4293(NGG) (WDW)

STORA ENSO CORP., NANCY NYBERG,
and CHRISTOPHE KUSEL,

                Defendant(s).
--------------------------------------------------------X

**WILLIAM D. WALL, United States Magistrate Judge:**

This matter was referred to the undersigned by District Judge Garaufis for the purpose of issuing a report and recommendation on the defendants' motion for summary judgment. DE[24]. For the reasons set forth herein, the undersigned recommends that the motion be granted and the complaint dismissed.

## PROCEDURAL BACKGROUND

Plaintiff Dianne Romano commenced this action on October 15, 2007 pursuant to Title VII and the New York State Human Rights Law ("NYSHRL"), alleging: (1) discrimination based on gender; (2) sexually hostile work environment; and (3) retaliation for complaining about discrimination. Defendants move for summary judgment, claiming that there are no genuine issues of material fact regarding plaintiff's claims and that they must be dismissed as a matter of law. Specifically, defendants argue that (1) plaintiff has failed to establish a prima facie case of discrimination; (2) plaintiff's hostile work environment claims are facially neutral and not severe or pervasive to sustain a claim under Title VII; and (3) that plaintiff has failed to establish a prima facie case of Title VII retaliation.

**STATEMENT OF FACTS**

**<u>Plaintiff's Employment with Stora Enso</u>**

Romano was hired at Stora Enso as a Senior Account Manager in or about August 2005.

56.1 Stmts, ¶¶6-7; Pl. Ex. 1; Complaint ¶9; Pl. Ex. 7. Stora Enso is in the business of selling

paper. Plaintiff reported directly to defendant Nancy Nyberg, then the Northeast Regional

Manager, when she first started working at Stora Enso. Pl. 56.1 Stmt, ¶59; Romano Dep., p.23.

According to defendants, plaintiff's employment responsibilities included new business

development and expansion of existing business relationships by calling on printers and end

users. Plaintiff states that her responsibilities entailed working with end users, designers and

printers. 56.1 Stmts. ¶8, Pl. 56.1 Stmt, ¶60; Romano Dep., pp.23-24; Nyberg Dep., p.34; Kusel

Dep., p.16.

On December 16, 2005, during a group sales meeting and in the presence of

approximately twelve other Stora Enso employees, Romano complained to Nyberg about the

number of meetings and conference calls in which she was required to participate. Plaintiff

alleges that subsequent to this meeting, Nyberg "punished" her by refusing to speak with her for

four weeks. 56.1 Stmts., ¶¶9-10; Pl. 56.1 Stmt., ¶175. Specifically, plaintiff testified that

"…after the December meeting [Nyberg] basically punished me for four weeks and I didn't hear

from her. And I heard from my colleagues that she was very angry with me." Romano Dep.,

Def. Ex. A, p.48. Plaintiff also asserts that she invited Nyberg to tea to discuss the December

2005 meeting, but Nyberg ignored her invitation. Pl. 56.1 Stmt, ¶177; Romano Dep., p.48.

Nyberg acknowledges that she became less trustful of plaintiff after the meeting. 56.1 Stmts,

¶10; Pl. 56.1 Stmt, ¶176; Romano Dep., p.48; D. Nyberg Dep., p.99.

In or about January 2006, plaintiff and Nyberg met to discuss the December 2005 sales

2

meeting.  Plaintiff claims that Nyberg "reprimanded" her for speaking up at the meeting.  During the January 2006 meeting, plaintiff says that she asked Nyberg to refrain from looking at her "from toe-to-head "(also referred to by the plaintiff as a "once over") and advised Nyberg that, in the plaintiff's opinion, Nyberg treated women differently from men.  Pl. 56.1 Stmt, ¶¶178-180; Romano Dep. pp.49, 117-120; Nyberg Dep., pp. 107-109.  In response to plaintiff's allegation, Nyberg told plaintiff to think of her as a man trapped in a woman's body if that would make communication easier for plaintiff.  Pl. 56.1 Stmt, ¶¶181-182;Romano Dep., pp.118- 120; Nyberg Dep., p.113.

In March 2006, after Romano had been employed at Stora Enso for approximately seven months, Nyberg evaluated plaintiff's job performance.  Nyberg's overall evaluation of Romano's job performance at that time was good, and there were a number of favorable comments about her performance.  56.1 Stmts, ¶¶11-12; Pl. 56.1 Stmt, ¶157; Def. Ex. H, Pl. Ex. 8; Romano Dep. pp. 241-246.  The March 2006 evaluation contained targets for Romano for the "Next Period – '06," targets that would be used to measure her job performance going forward. Pl. 56.1 Stmt., ¶¶157-159; Romano Dep. p. 239; Pl. Ex. 8.  Plaintiff's targets for the "Next Period – '06" were to: "develop new business program at Computer Associates for at least 500 new tons[1] ; establish new buying programs at 3 printers in market for 750 tons of new business and gain at least 500 new tons of business in 2006.  Pl. 56.1 Stmt, ¶160; Pl. Ex. 8.

The parties dispute the extent to which Romano met those goals.  Nyberg did not have a specific tonnage target for plaintiff to produce in her first full year at Stora Enso, but the plaintiff claims that she procured 750 tons of business from printers with whom she established a

---

[1] The parties use the word "tons," presumably referring to tons of paper, to describe increases in business.

business relationship.  Pl. 56.1 Stmt, ¶166; Nyberg Dep. p. 136; Romano Dep. p. 257.  The parties appear to agree that the plaintiff secured business relationships with the following printers: CGI, Hamer, Pictorial, Earth Color, Sandy Alexander, LP Thebault, Unimax, and Topan and Hamer.  Pl. 56.1 Stmt, ¶¶164-165; Romano Dep. pp. 256-257.  The plaintiff maintains that measurement of her success was affected by the fact that she did not maintain any direct accounts.  Therefore, according to plaintiff, any sales procured from an account worked on by her would be attributed to the employee in charge of that account.  Pl. 56.1 Stmt, ¶161;Romano Dep. p. 252.  In terms of the "Next Period '06" goals, Nyberg testified that she does not know if plaintiff obtained her required amount of business from Computer Associates or from three printers in the market, but did state that plaintiff worked very hard to get new business from Vonnage.  Pl. 56.1 Stmt, ¶162; Nyberg Dep. pp. 130-132, 134-135.

In or about October 2006, defendant Christophe Kusel replaced Nyberg as the Northeast Regional Manager, and Nyberg became the East Merchant Sales Director.  56.1 Stmts, ¶5; Pl. 56.1 Stmt, ¶63; Kusel Dep. pp. 5-7; Nyberg Dep. pp. 31-32.  Plaintiff claims that she began reporting directly to Kusel on or about November 6, 2006.  Pl. 56.1 Stmt, 65; Pl. Dep. p. 277.  He testified that he does not know if plaintiff brought in new business from Verizon, Vonnage or LP Thebault, and as of  November 20, 2006, Kusel did not have any data showing whether or not plaintiff had produced any new business.  Pl. 56.1 Stmt, ¶167; Kusel Dep. pp. 76-78.  He further testified  that it was difficult to determine if plaintiff had added growth to any Stora Enso accounts because it was hard to distinguish who was responsible for the growth.  Pl. 56.1 Stmt, ¶¶167-169; Kusel Dep. pp. 73-74, 79.  On November 27, 2006, Nyberg wrote in an e-mail to non-party Doreen McDonald, Director of Employment Services, that because Romano did not have merchants as assigned customers, it was difficult to measure her efforts.  Pl. 56.1 Stmt,

¶170; Pl. Ex. 13. Nyberg could not quantify the amount of business procured by plaintiff. Pl. 56.1 Stmt, ¶171; Nyberg Dep. p. 202.

### **Discussions with Plaintiff Regarding her Job Performance**

In the fall of 2006, all members of the northeast region were asked to schedule an appointment with Nyberg to review their International Position Evaluation & Salary Range Communications ("IPE's"). During a meeting on November 3, 2006, Nyberg says that she informed plaintiff that she was not having a positive impact on the metro market and that she was not developing new business as expressly required by her position. 56.1 Stmts, ¶¶13-14; Nyberg Dep. pp. 168, 194. Plaintiff denies that her alleged poor performance was ever discussed at the meeting. Pl. 56.1 Stmt, ¶¶203-05; Def. Ex. P.

Plaintiff alleges that prior to their November 3, 2006 meeting, Nyberg did not document her alleged poor performance. Pl. 56.1 Stmt, ¶213; Nyberg Dep. p. 171. However, prior to the November 3, 2006 meeting, Nyberg had communicated to plaintiff that she was spending too much time on the Verizon account, and that she was not fulfilling her goal of obtaining new printer accounts.[2] 56.1 Stmts, ¶15;Nyberg Dep. pp. 161, 170-71, 173. Nyberg has testified that she believed that plaintiff was unhappy in her position as Senior Account Manager, and she asked plaintiff during their November 3, 2006 meeting if she was interested in transferring to a Specification Representative position, without a reduction in salary. Plaintiff says that she viewed the offer as a demotion in status and salary, and claims that Nyberg did not tell her that her salary would remain the same if she accepted the Specification Representative position. 56.1

---

[2] In her Rule 56.1 Counterstatement, plaintiff does not controvert that defendant Nyberg communicated this information to her, but rather denies having spent too much time on the Verizon account. However, as revealed by her deposition testimony, an e-mail to Nyberg and Statement of Fact ¶ 25, plaintiff agreed that she had in fact spent too much time on the account. (56.1 Stmts, ¶¶15, 25; Romano Dep. p. 214, 261-62; Nyberg Dep. p. 55).

Stmts, ¶16; Pl. 56.1 Stmt, ¶206, 212; Nyberg Dep. p. 170-72; Romano Dep. pp. 186-87. Nyberg

further told plaintiff at their November 3, 2006 meeting that if she was not interested in the

Specification Representative position, she would need to develop a plan to make her current job

have a stronger and more positive impact on the company. Plaintiff states that she was asked to

submit a "proposed revision and plan for her current position." 56.1 Stmts, ¶17, Pl. 56.1 Stmt,

214; Nyberg Dep. pp. 171-72, 187; Romano Dep. p. 263-64. Nyberg and Kusel did not give

plaintiff specific parameters for the proposed revision and plan, nor did they tell plaintiff that her

plan was supposed to be "actionable and time driven." Pl. 56.1 Stmt, ¶¶215, 220; Nyberg Dep.

p. 172; Kusel Dep. pp. 50-51.

Later that day, Nyberg sent plaintiff an e-mail summarizing what they had discussed

during the November 3rd meeting and attached a copy of the job description for Specification

Representative. Plaintiff does not dispute that defendant Nyberg sent this e-mail, but denies that

she and Nyberg discussed plaintiff's alleged performance deficiencies or, as noted earlier, that

she was told that her salary would remain the same if she accepted the Specification

Representative position. 56.1 Stmts, ¶18; Pl. 56.1 Stmt, ¶¶216-217; Nyberg Dep. p. 172;

Romano Dep. p. 186-87; Def. Ex. I.

During the time of these discussions between plaintiff and Nyberg, defendant Kusel had

been promoted to Nyberg's position as Regional Manager and had, thus, become plaintiff's

supervisor. Despite this change, only Nyberg continued to work with plaintiff because, Nyberg

maintains, did not believe it was fair to transfer responsibility for plaintiff to Kusel since it was

his first management position. Kusel was, however, kept informed of communications between

Nyberg and plaintiff regarding plaintiff's position. 56.1 Stmts, ¶¶19-20; Nyberg Dep. p. 174-75;

Def. Ex. I.

Plaintiff states that she did not have any concern that her employment would be terminated after receiving the November 3rd email. 56.1 Stmts, ¶ 21; Romano Dep. pp. 172. On November 10, 2006, plaintiff advised Nyberg that she would not accept the Specification Representative position and would, therefore, develop a plan for her current position. On November 14, 2006, Nyberg left plaintiff a voice message asking plaintiff to explain why she had rejected the position. In response, plaintiff sent Nyberg a memo, agreeing with Nyberg that she had been spending too much time on the Verizon account and recognizing that it was time to move forward. 56.1. Stmts, ¶¶23-25; Pl. 56.1 Stmt, ¶¶218-19, 221-22; Nyberg Dep. pp. 177-79; Romano Dep. pp.173, 259-60, 271. Plaintiff specifically stated that "[I] agree with [Nyberg] that most of my time has been spent with Verizon and Vonage. . . and I agree that this needs to be changed but I strongly feel that the time spent gave me the Stora Enso education I needed to handle the details. It is time to move forward." Pl. Dep. pp. 261-62; 56.1 Stmts, ¶25.

On November 17, 2006, plaintiff submitted a proposed "revision and plan for her current position." Defendants state that plaintiff merely submitted an e-mail attaching a "description of her current job with revisions" and she did not provide a plan with specific details about what could be done to make her more successful in her current position. 56.1. Stmts, ¶¶26-27; Pl. 56.1 Stmt, ¶223; Romano Dep. pp. 263-64, 271, 286; Nyberg Dep. pp. 187-88; Pl. Ex. 15, Def. Ex. K. On November 19, 2006, Nyberg forwarded plaintiff's revised job description/proposed plan via e-mail to Doreen McDonald and defendant Kusel, requesting McDonald's advice on how to proceed. In her e-mail, Nyberg stated that her best case option was to again suggest to plaintiff that she consider the Specification job, or else terminate her employment. 56.1 Stmts, ¶28; Pl. 56.1 Stmt, ¶¶226-27; Nyberg Dep. pp. 191-92; Kusel Dep. pp. 67-68; Pl. Ex. 12, Def. Ex. L. Nyberg does not recall telling plaintiff that her proposed plan needed to be more specific

or that it needed to be more brief and to the point.  Pl. 56.1 Stmt, ¶229; Nyberg Dep. pp. 189-90,

192, 195-96.  Furthermore, at no time prior to sending her November 19, 2006 e-mail to

McDonald and Kusel did Nyberg inform plaintiff that her proposed plan was unacceptable.  Pl.

56.1 Stmt, ¶230; Nyberg Dep. p. 187.

Kusel and McDonald agreed that plaintiff's response was a redefinition of her job

description rather than a plan for improving her performance in her position.  56.1 Stmts, ¶29;

Kusel Dep. p. 64; McDonald Dep. pp. 22, 29.  By email dated November 20, 2006, McDonald

advised Nyberg that plaintiff's response was unacceptable and if she refused to perform the tasks

required of her it was time to consider terminating the employment relationship.  56.1 Stmts,¶30;

Pl. 56.1 Stmt, ¶234; Def. Ex. M, Pl. Ex. 16.  Plaintiff does not deny that this discussion took

place, but misquotes McDonald, claiming that McDonald stated the following in her email: "that

Romano is not so successful as account manager; that she does have plans for her new duties;

that Romano should be offered again the demotion to Specification Representative; and we can't

continue with Romano's contribution levels as account manager."  This is a mischaracterization

of McDonald's actual statements. First, McDonald merely acknowledged that *Nyberg* stated that

plaintiff "is not so successful as account manager."  Def. Ex. M; Pl. Ex 16 (emphasis added)

Next, McDonald stated that plaintiff took it upon herself to create a new job description rather

than develop a plan for her current role and that the company could not allow employees to make

up their own titles and responsibilities.  Lastly, McDonald suggested to Nyberg that she provide

plaintiff again with the duties of a Specification Representative, but  McDonald never referred to

the position as a demotion.  Pl. 56.1 Stmt, ¶¶30, 235; D. Ex. M, P. Ex. 16.  Romano states that

McDonald never told her directly that the plan was unacceptable, and that Kusel did not tell her

it was unacceptable until December 4, 2006, after she had filed an internal discrimination

complaint.  Pl. 56.1 Stmt., 230, 233; Kusel Dep. p. 65-66; McDonald Dep., pp. 23-24.

On November 21, 2006, Nyberg left plaintiff a voice message directing her to attend a meeting on November 29, 2006 to discuss her position with the company.  Plaintiff disagrees that Nyberg specified the subject matter of the meeting, and states that despite "numerous attempts" to meet with defendants subsequent to submitting her November 17, 2006 proposed plan and revision, the November 29th meeting was cancelled.  In fact, the meeting was rescheduled for December 4, 2006.  56.1 Stmts, ¶41; Romano Dep. pp. 279-84.

Plaintiff was concerned that her employment would be terminated at the scheduled meeting, and, on November 22, 2006, she telephoned the company's Employee Assistance Program hotline, and reports that she spoke to someone for 20 minutes. 56.1 Stmts, ¶31-32; Romano Dep. p. 168-69, 282-83; Complaint ¶200.  She had not called the Employee Assistance Program hotline before November 22, 2006.  56.1 Stmts, ¶¶33-34; Romano Dep. pp. 170, 188.

On November 26, 2006, prior to the planned meeting,  plaintiff sent a letter to John Gillen, the President of Stora Enso.  Plaintiff describes this letter as a complaint that she filed "due to Defendants' ongoing discrimination and sexual harassment."  Pl. 56.1 Stmt. ¶35.  In her letter to Mr. Gillen, plaintiff complained about a "hostile work environment – one filled with – manipulation, extreme negativity towards our customers, derogatory comments about colleagues and men, fear of being fired for having an opinion, inconsistent direction, micro-management and controlling behavior." Def. Ex. N.  She also complained of "being forced to accept a demotion, a hostile work environment, [women]being treated differently than men," and listed instances of alleged behavior by Nyberg that demonstrated Romano's charge that Nyberg was a "toxic boss."  56.1 Stmts, ¶¶35-36; Romano Dep. p. 168; Def. Ex. N.

Some of the incidents alleged in the letter are relied on by the plaintiff in her opposition

to the motion for summary judgment as examples of not only hostile work environment, but gender discrimination as well. Nowhere in the letter did Romano expressly state that Nyberg engaged in gender discrimination. Plaintiff claimed, *inter alia*, that she had "heard stories of people 'gloriously' fired (NYC Specification Rep) or pushed out into other areas of Stora Enso (Senior Account Manager) or who have chosen to leave rather than endure the unhealthful environment (NE Technical Services Rep, Sr. Account Mgr)," but each of those instances involved male employees and do not support a claim of sex discrimination against women. Plaintiff states in opposition that "Nyberg did not treat men differently in the workplace and male employees were not subjected to sexual harassment and gender discrimination." Pl. 56.1 Stmt. ¶38; Romano Dep. p. 206. Romano seemed to be complaining that Nyberg treated everyone badly, male or female.

After plaintiff submitted her letter to Mr. Gillen, Ms. McDonald investigated the complaint. McDonald spoke with plaintiff, defendants Kusel and Nyberg, and with all of the employees who at that time reported to Nyberg, as well as with two employees who had previously reported to Nyberg. Based on her investigation, McDonald concluded that no harassment or discrimination had taken place. 56.1 Stmts,¶39; McDonald Dep. pp. 16-17, 37; Kusel Dep. p. 81; Nyberg Dep. pp. 205-07; Romano Dep. pp. 211-12. Plaintiff states that McDonald investigated plaintiff's complaint while she was working with defendants Nyberg and Kusel to catalog plaintiff's alleged poor performance. Furthermore, plaintiff states that despite her allegations of sexual harassment in her letter to Mr. Gillen, McDonald opined that plaintiff had not complained of sexual harassment. This is an improper reading of McDonald's deposition testimony. McDonald stated that the actions of which plaintiff complained were not sexual in nature and did not amount to sexual harassment.

After plaintiff lodged her complaint with Gillen, McDonald removed Nyberg from discussions relating to plaintiff's job performance. Plaintiff, however, contends that Nyberg remained heavily involved in discussions relating to plaintiff's job performance.[3] 56.1 Stmts, ¶40; Nyberg Dep. p. 208; Pl. Ex. 17. On November 27, 2006, Nyberg forwarded plaintiff's March 2006 performance evaluation to McDonald via e-mail. Pl. 56.1 Stmt, ¶236; Pl. Ex. 13.

On December 4, 2006, plaintiff met with Kusel and McDonald to discuss the revised job description/proposed plan which she had submitted to Nyberg on November 17, 2006. Plaintiff denies that they discussed her plan, and alleges that Kusel told her that her performance was deficient without mentioning the plan. 56.1 Stmts, ¶42; Pl. 56.1Stmt, ¶¶237-38; Kusel, Dep. p. 84; McDonald Dep. pp. 41-42; Romano Dep. pp. 284-86; Def. Ex. O. During the meeting, Kusel and McDonald gave plaintiff a memo dated December 4, 2006 containing a plan for the position of Senior Account Manager and outlining Stora Enso's 2007 goals for plaintiff. The memo called for Romano to develop 10,000 tons of new business at end users and printers who were not currently Stora Enso customers, of which 3,000 tons had to be sheets, with a minimum of

---

[3] In support of her allegation, plaintiff cites to the following documents, which may indicate that Nyberg remained involved in discussions regarding plaintiff's job performance: public outlook calendar dated November 30, 2006, with the subject Accepted: Performance Discussion, from Nancy Nyberg to Doreen McDonald; a public outlook calendar dated December 1, 2006, subject performance discussion, sent to Doreen McDonald, Nancy Nyberg, Christophe Kusel and Paul Clancy; an email with attachment dated December 1, 2006, from Nancy Nyberg to Christophe Kusel, Doreen McDonald and Paul Clancy, subject re: Romano; an email with attachment dated December 2, 2006, from Christophe Kusel to Paul Clancy, Doreen McDonald and Nancy Nyberg, subject: Required plan; an email dated December 9, 2006, from Nancy Nyberg to Christophe Kusel, Paul Clancy and Doreen McDonald, subject re: Required plan; a public outlook calendar dated December 11, 2006, subject: Accepted: Updated: Conf call w/HR, from Nancy Nyberg to Doreen McDonald; and email with attachment dated December 12, 2006, from Nancy Nyberg to Paul Clancy and Christophe Kusel, subject: performance conversation timeline; and an email dated December 12, 2006, from Nancy Nyberg to Christophe Kusel and Doreen McDonald, subject: re: term ltr. (Pl. Ex. 17).

2,000 tons of Centura and Productlith.  Pl. 56.1 Stmt, ¶¶239-41; Def. Ex. 0. Plaintiff claims that

she was the only Stora Enso employee who was charged with those duties.  Nyberg testified that

a Stora Enso employee in Chicago may have had similar duties.  Kusel testified that he was not

sure if any other employees had similar duties.  Pl. 56.1 Stmt, ¶242; Nyberg Dep. pp. 210-11;

Kusel Dep. p. 87.

Romano was told to take one week away from work, with pay, to formulate a written plan that

would outline her commitment and efforts for bringing her job performance to an "actionable

level."  Plaintiff says she did not understand why she was asked to submit another plan and

claims that when she asked Kusel and McDonald what was required of her, "her questions were

met with silence and without explanation."  Plaintiff was expressly advised that termination was

one of the possible outcomes if she failed successfully to formulate a written plan.  In order to

assist plaintiff, Kusel provided plaintiff with a description of her job responsibilities and goals

for December 2006 and the first and second quarters of 2007.  56.1 Stmts, ¶¶43-44; Pl. 56.1

Stmt, 243-45; Kusel Dep. p. 84; Romano Dep. p. 285-89, 292-94.

On December 8, 2006, plaintiff submitted her response to the request for a plan.  The first

two pages of it did not set forth a plan, but expressed Romano's belief that she being retaliated

against for complaining about discrimination in the workplace, listing and defending her job

performance.  Def. Ex. P.  The remainder of the document set forth Romano's "plan."  As to the

"plan" portion of the memo,  Kusel was "disappointed," because in his view the response did not

present a plan for how plaintiff would accomplish the goals he had set.  Instead, Romano

identified work assignments and tasks which should be performed by other Stora Enso

employees.  Specifically, plaintiff indicated that to achieve the goals set by Kusel, she would

need Stora Enso's librarian services for three full weeks to develop all the research on target

accounts and approximately thirty hours of time a month from each of the three merchant account representatives to work on the target accounts. Defendants and plaintiff agree that, typically, Stora Enso employees perform their own research for targets in their market area. 56.1 Stmts, ¶49; McDonald Dep. p. 47. Plaintiff states that in addition to requesting librarian services, she also identified targets and tonnage in her plan, pursuant to Kusel's and McDonald's instructions. 56.1 Stmts, ¶¶45-48; Pl. 56.1 Stmt, ¶ 246; Def. Ex. P; Kusel Dep. p. 93; McDonald Dep. pp. 46-47. Nyberg states that she did not review plaintiff's December 8, 2006 plan to determine whether it was acceptable.but plaintiff points out that on December 8, 2006, via e-mail, Kusel forwarded plaintiff's plan to Paul Clancy (Nyberg's supervisor), McDonald and Nyberg. On December 9, 2006, Nyberg e-mailed Kusel, Clancy and McDonald, commenting that she did not see a plan for performance improvement in the document. 56.1 Stmts, ¶50; Nyberg Dep. pp. 215-16; P. Ex. 17.

Based on their belief that the plaintiff had failed to submit a plan in accordance with Kusel's request, on December 13, 2006, Kusel and McDonald met with plaintiff to advise her that her employment was being terminated. Plaintiff alleges that her employment was terminated because she filed a complaint with Mr. Gillen on November 26, 2006. 56.1 Stmt, ¶¶51-52; Pl. 56.1 Stmt, ¶¶ 247-50; Kusel Dep. pp. 95-96; McDonald Dep. pp. 46, 51-52; Def. Ex. Q. A letter dated December 13, 2006 from McDonald to Romano states that a "thorough investigation" was conducted based on the letter, and that it was concluded that there had been no "gender discrimination." Defs. Ex. Q. It was further concluded that Stora Enso could no longer "continue [its] employment relationship" with Romano. Id. The letter details Stora Enso's view that Romano did not provide an improvement plan with the demanded details.

**Facts Relating to Plaintiff's Allegations of Gender Discrimination, Sexual Harassment and Hostile Work Environment**

In support of her claim regarding sexual harassment, plaintiff alleges, generally, that (a) Nyberg looked at her from head to toe and commented about her attire and hair (Pl. Dep. pp. 26-27); (b) on one occasion Nyberg touched plaintiff's hair and said it looked good and on another occasion touched plaintiff's jacket and also commented favorably (Pl. Dep. pp. 52-53, 55-56); (c) Nyberg allegedly directed plaintiff to think of Nyberg as a man trapped in a woman's body (Pl. Dep. p. 34); (d) Nyberg advised plaintiff that Nyberg and her husband had a "date" night (Pl. Dep. pp. 27-28); and (e) Nyberg held a bridal lingerie party for one of plaintiff's female co-workers and did not invite any male employees (Pl. Dep. pp. 58-59). Def. 56.1 Stmt, ¶ 53.

Romano stated that when Nyberg stared at her from "toe-to-head," starting at her shoes and gradually looking up her body, Nyberg was looking with an expression of "evaluation and interest." Plaintiff could not describe precisely what she meant by "evaluation and interest," but eventually testified that in her opinion it meant "sexual harassment." Pl. 56.1 Stmt, ¶¶53, 77, 79; Romano Dep. pp. 26-27; 113-14; 133-35. Romano further claims that when Nyberg talked about "date nights" with her husband, the commentary was often of a sexual nature. For instance, Nyberg allegedly said she looked forward to having sex with her husband and when she is home, she is "quite the little housewife cooking, cleaning and taking care of her husband." Plaintiff recalls that on another occasion, Nyberg told her that if her husband did not have sex with her, she would "take revenge in the form of shopping." This is somewhat different from plaintiff's deposition testimony, in which she stated that Nyberg said if her husband did not come home for the weekend she would shop. Pl. 56.1 Stmt, ¶¶53, 82-86; Romano Dep. p. 27-29; Nyberg Dep. pp. 64-66. Romano claims that Nyberg may also have discussed her sex life with female co-

workers, Kennedy and Fawber, but that Nyberg did not discuss her sex life or sex in general with Kusel, a male.  Pl. 56.1 Stmt, ¶¶87-90; Kennedy Dep. p. 29; Kusel Dep. pp.26-28.

Plaintiff further claims that Nyberg discussed her alleged personal relationship with a male customer of Stora Enso.  Plaintiff states that Nyberg spoke of the customer as if he was her lover.  Supposedly, Nyberg stated that he was her soul mate and if they were not already married to other people, they would be together.  Nyberg testified that the customer had stated that if they were not married, he and Nyberg would be together.  Nyberg Dep. p. 75-76.  Nyberg also allegedly told plaintiff about issues the customer had with his prostate and with his difficulty in performing sexually.  Plaintiff claims that on one occasion, Nyberg told plaintiff that he took out his Viagra pills and remarked that they were for his sexual performance.  Nyberg would allegedly relay these stories to plaintiff in a "sexual tone."  Plaintiff claims to have felt humiliated and intimidated by Nyberg's commentary.  Pl. 56.1 Stmt, ¶¶53, 91-101; Romano Dep. pp. 30-32, 36; Nyberg Dep. pp. 78-81.

Plaintiff next states that on one occasion, Nyberg touched plaintiff's hair and said, "oh, your color looks good."  Pl. 56.1 Stmt, ¶¶53, 102; Romano Dep. p. 52; Nyberg Dep. p. 152. Plaintiff says that she considered this touching and commentary to be a sexual advance and therefore she felt intimidated and humiliated.  On another occasion, Nyberg touched plaintiff on the upper arm of her suit jacket and said, "oh, that's nice."  Again, plaintiff claims to have felt humiliated and intimidated by this action.  Pl. 56.1 Stmt, ¶¶103-04; Romano Dep. pp. 52-55. Next, plaintiff states that in or about April 2006, at an industry convention, Nyberg sat "very close" to plaintiff, making her feel uncomfortable.  Later that evening, Nyberg allegedly stared at plaintiff from head to toe and touched plaintiff's upper shoulder for four seconds.  Pl. 56.1 Stmt, ¶¶53, 109; Romano Dep. pp. 159-63.

Further, plaintiff states that Nyberg organized a bridal lingerie party for a female co-worker and invited only female employees to the party. Nyberg also invited the female employees to sleep at her house after the bridal shower. Plaintiff felt that the lingerie bridal shower and sleepover invitation were inappropriate and alleges that her female colleagues replied "yuck" when informed that they were invited to sleep at Nyberg's home. Pl. 56.1 Stmt, ¶¶53, 111-15; Romano Dep. pp. 58-61, 70; Fawber Dep. pp. 33, 35; Kennedy Dep. p. 56; Nyberg Dep. pp. 119-20; Kusel Dep. p. 41.

Plaintiff's co-workers have allegedly seen Nyberg look at male employees from head to toe. Kennedy Dep., pp. 47-48; Fawber Dep., p. 16. Plaintiff disputes this fact insofar as Kusel stated that Nyberg never ran her eyes up and down his body or touched him in an inappropriate way. Nor did plaintiff ever observe Nyberg look at her male colleagues from "toe-to-head." 56.1 Stmts, ¶54; Pl. 56.1 Stmt, ¶¶80-81, 106, 116; Kusel Dep., pp.21-22, 40; Romano Dep., pp.115-16.

### Plaintiff's Statement of Additional Facts

Plaintiff has submitted a statement of additional facts in support of her claims, beyond those in response to the defendants' Rule 56.1 Statement. Some of the "additional" facts repeat facts from her counter-statement, and some are new. Further, some of the additional facts are largely hearsay, referring to the plaintiff's reports of conversations between Nyberg and people other than plaintiff. To the extent that these facts are relevant to the motion, they will be reported here, with the proviso that the court will not consider hearsay statements.

Romano states that, on numerous occasions, Nyberg attempted to cause friction between plaintiff and female employees Kennedy, Fawber and Kathleen Byrnes, but did not attempt to cause friction between plaintiff and her male colleagues. Pl. 56.1 Stmt, ¶¶141-42; Romano Dep.

pp. 70, 140.  Plaintiff describes the friction as follows: Nyberg would tell Kennedy that plaintiff made comments about her and then Kennedy would ask plaintiff if she in fact had made such comments.  Pl. 56.1 Stmt, ¶¶145-146; Romano Dep. p.108.  Plaintiff asked Kennedy if she was talking about her to Nyberg.  Plaintiff claims that Kennedy replied that Nyberg "liked to stir the pot with female employees."  Kennedy, however, testified only that  Nyberg was telling her and plaintiff different things regarding control of the Verizon account.  Pl. 56.1 Stmt, ¶¶151-52; Romano Dep. pp. 108-09; Kennedy Dep. pp. 25-26.

Furthermore, plaintiff asserts that she discussed with Kennedy, Fawber and Byrnes the possibility that Nyberg treated them differently because they are women.  Pl. 56.1 Stmt, ¶138-39; Kennedy Dep. p. 44.  Fawber testified that the discussions were about how Nyberg commented on their attire, not about any disparate treatment. Fawber Dep. pp. 25-26.  Kennedy testified that she knew plaintiff felt she was being treated unfairly by Nyberg.  Kennedy also stated that since both she and plaintiff realized they were being told different things by Nyberg regarding the Verizon account, they were "trying to almost come up with possibilities of why" Nyberg was telling them different things.  When asked if she and plaintiff had come up with a reason why, Kennedy testified that maybe it was because they were women and that was "just how Nyberg [was] with everybody."  Kennedy Dep. p. 44-45.  Plaintiff claims that Kennedy told Nyberg that plaintiff was unhappy at work because she felt as though she was being discriminated against.  Pl. 56.1 Stmt, ¶¶189, 193; Romano Dep. p. 185.  Kennedy testified that she told Nyberg that Romano was unhappy about inconsistencies related to the Verizon account, but never told Nyberg that Romano was unhappy because she felt discriminated against. Kennedy Dep., pp. 63-64.

In addition, Romano claims that Nyberg told her female subordinates that she felt like

their mother, but did not tell her male subordinates that she felt like their mother. Pl. 56.1 Stmt, ¶¶117, 120; Nyberg Dep. pp. 82-83. Nyberg testified that she only recalled telling one employee - Kathleen Byrnes - that she felt like her mother. Nyberg Dep. pp. 82-83.

Plaintiff alleges that Fawber told plaintiff that Nyberg "inappropriately" touched Fawber's hair and clothing, but Fawber never testified that Nyberg touched her, let alone "inappropriately." Rather, Fawber stated that Nyberg commented on her appearance. Nyberg allegedly told Fawber that she was attractive, but had the personality of an ugly girl. Pl. 56.1 Stmt, ¶¶122-23; Romano Dep. pp. 153-54; Fawber Dep. p. 46-47. Further, plaintiff states that on one occasion, while discussing Fawber's dark hair, Nyberg told Fawber that "we are coming into the trade show season, and then all the men want to touch you good." Again, this is not what Fawber testified. Fawber stated that Nyberg told her "[m]aybe that is a good thing because we are coming into the trade show season, and then all the men won't want to touch you." Fawber further states that she does not know where the word "good" came from. Pl. 56.1 Stmt, ¶124; Fawber Dep. pp. 47-48. Nyberg did sometimes comment on Fawber's appearance, and she sent Fawber a photograph of Nyberg's husband dressed as a cowboy on Halloween. Pl. 56.1 Stmt, ¶¶126,129; Fawber Dep. p. 14. Nyberg sent Kennedy a note critiquing her manner of dress, which Kennedy considered inappropriate. Pl. 56.1 Stmt, ¶¶127-28; Kennedy Dep. p. 45-46; Fawber Dep. pp. 26-27.

Fawber told Nyberg that plaintiff was upset with Nyberg. Pl. 56.1 Stmt, ¶190; Fawber Dep. p. 40. In or about January 2006, plaintiff told Kusel that Nyberg treated the women at Stora Enso differently than the men. Pl. 56.1 Stmt, ¶191; Kusel Dep. p. 45. In October 2006, plaintiff told Kennedy that Nyberg discriminates against females and that she was thinking of filing a complaint against Nyberg. Pl. 56.1 Stmt, ¶192; Kennedy Dep. p. 64).

Romano states that, on more than two occasions, she attempted to call the telephone number listed on Enso's harassment policy to report harassment in the workplace, but no one answered. Pl. 56.1 Stmt, ¶¶196-97; Romano Dep. p. 146. On or about November 22, 2006, plaintiff called Stora Enso's Employee Assistance program, allegedly to report discrimination, hostile work environment and retaliation and did speak to someone. She also spoke with an EAP representative on another occasion after November 22, 2006. P. 56.1 Stmt, ¶¶198-99; Romano Dep. pp.188, 190-91. Plaintiff claims that her November 26, 2006 letter to John Gillen, President of Stora Enso, copied to Eric Wangen, Scott Lipinski, Human Resources Personnel, Russel Wanke, Director of the Divison and Paul Clancy, Nyberg's supervisor, was an internal complaint alleging discrimination and sexual harassment.. Pl. 56.1 Stmt, ¶¶200-01; Romano Dep. p.119, 192-94; Def. Ex. N.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). At this stage, the burden of proof is on the moving party to show that there is no genuine issue of material fact. Gallo v. Prudential Residential Services, L.P., 22 F.3d 1219, 1223 (2d Cir. 1994)(citing Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975)). A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In making this determination, the court must view all of the evidence "in the light most favorable" to the non-movant. Breland-Starling v. Disney Publishing Worldwide, 166 F.

Supp.2d 826, 829 (S.D.N.Y. 2001)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  In addition, the court must resolve all ambiguities and draw all inferences in favor of the party opposing the motion.  Ackerman v. National Financial Systems, 81 F. Supp. 2d 434 (E.D.N.Y. 2000).  Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56; see Liberty Lobby, 477 U.S. at 250.

In opposing the motion, the nonmoving party may not rely upon "mere conclusory allegations, speculation, or conjecture."  Ackerman v. National Financial Systems, 81 F. Supp. 2d 434, 436 (E.D.N.Y. 2000) (citing Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)).  However, "if there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable."  Holt v. KMI Continental Inc., 95 F.3d 123, 129 (2d Cir. 1996).

The Second Circuit has  indicated that trial courts should be wary of granting summary judgment in discrimination cases since intent and state of mind are typically at issue and direct evidence of discriminatory intent is rare.  Tarshis v. The Riese Organization, 195 F. Supp. 2d 518, 523-24 (S.D.N.Y. 2002); see also Holz v. Rockefeller & Co.,Inc., 258 F.3d 62, 69 (2d Cir. 2001).  Nonetheless, cases involving allegations of workplace discrimination and harassment are still subject to summary judgment, and where the nonmovant fails to demonstrate a genuine issue of material fact, relief may be granted against such claims.  Holz, 258 F.3d at 69.  Here, aside from issues of intent, there is little dispute about the facts underlying the plaintiff's claims.  Rather, the dispute focuses on whether those claims rise to the level necessary to proceed to trial.

As is routine in this Circuit, the court will treat plaintiff's claims under Title VII and the New York State Human Rights Law "as analytically identical, applying the same standard of

proof to both claims." Dauer v. Verizon Communications, Inc., 613 F. Supp. 2d 446 (S.D.N.Y. 2009)(quoting Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n. 9 (2d Cir.2008) (considering sex discrimination claims)); see also Schiano v. Quality Payroll Sys., 445 F.3d 597, 609 (2d Cir. 2006) (hostile work environment and retaliation claims subject to same standards under federal and New York state law).

**Plaintiff's Discrimination Claim**

Plaintiff claims that she was fired on the basis of unlawful gender bias in violation of Title VII and the NYSHRL. For the reasons discussed below, the court finds that plaintiff's claims fail as a matter of law under both statutes. The claims must be addressed under the McDonnell Douglas /Burdine burden-shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). Under the McDonnell Douglas test: (1) plaintiff must prove a *prima facie* case of discrimination; (2) defendants must then articulate a legitimate, non-discriminatory reason for plaintiff's dismissal; and (3) to prevail, plaintiff must prove that defendants' proffered reason was not their true reason, but rather a pretext for intentional, unlawful discrimination. We turn to a consideration of those factors.

**Plaintiff Must Prove a *Prima Facie* Case of Discrimination**

To establish a *prima facie* case of discrimination with regard to her termination, plaintiff must show that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties of her position; (3) she was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. See  Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002). Defendants argue that plaintiff cannot establish elements (2) and (4) and, therefore, does not

make out a *prima facie* case.

**Plaintiff's Job Performance**

To determine if an employee's job performance was satisfactory, a court must look to "the employer's criteria for the performance of the job." Thornley v. Penton Publishing, 104 F.3d 26, 29 (2d Cir. 1997). This standard is subjective and, thus, must be examined through the lens of the actual employer at issue, "not the standards that may seem reasonable to the jury or judge." Id. at 29-30. In considering this issue, courts may rely on evaluations prepared by the employee's supervisors. Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985).

As set forth at length in the statement of facts, *supra,* the parties disagree on the quality of the plaintiff's work performance. Defendants claim that plaintiff's employment was terminated because of her unsatisfactory job performance and refusal to develop a plan to improve her performance, as directed by her supervisor, Christophe Kusel, on December 4, 2006. Supporting their claim is the evidence of their meetings with the plaintiff on November 3, 2006 and December 4, 2006 and their demands that she create a new plan to improve her performance. Defendants contend that while they believed plaintiff had the skills to be successful in her position as Senior Account Manager, she ultimately failed to fulfill her job duties, i.e., to develop new business, and failed to develop a plan as directed. (Kusel Dep. pp. 71-72) She also declined to accept a transfer to the position of Specification Representative, which she viewed as a demotion.

The only evidence that the plaintiff submits to demonstrate successful job performance is the "very good" performance evaluation she received from Nyberg in March 2006. However, that was eight months prior to her December 4, 2006 meeting with Kusel, where plaintiff was told that failure to provide an adequate plan could result in termination of her employment.

Prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. Hines v. Hillside Children's Center, 73 F. Supp. 2d 308, 315 (W.D.N.Y. 1999). To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality. Id. Plaintiff does not point to any evidence that her performance remained the same between March 2006, when she received a favorable evaluation, and December 2006, when she was told her plan was not acceptable. Instead, plaintiff accuses defendants of failing to provide documented evidence of her poor performance.

The record does contain testimony by both Nyberg and Kusel that it was difficult or impossible to determine with accuracy how well Romano had met her new business goals. Nyberg Dep. pp.130-32, 134-35; Kusel Dep. pp.76-78. However, the record also contains undisputed evidence that the defendants believed that Romano was not meeting their expectations and was performing unsatisfactorily, starting with her meeting with Nyberg on November 3, 2006 and continuing through her submission of two different plans for improvement that her supervisors considered to be unacceptable. Nyberg Dep., pp. 187-88; Pl. Ex. 12; Kusel Dep., pp. 64, 93; McDonald Dep., pp. 22, 29, 46-47; Def. Ex. O. Considering the defendants' view "through the lens of the actual employer," they have established that there is no issue of material fact regarding Romano's poor job performance. See Thornley, 124 F.3d at 29-30. And, even if Romano had established a material issue of fact as to her job performance, she does not make out a prima facie case of discrimination, as explained *infra*, because her termination did not occur under circumstances giving rise to any inference of gender discrimination.

**Plaintiff's Termination Did Not Occur Under Circumstances Giving Rise to an Inference of Discrimination**

"An employee's subjective belief that [she] suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate, non-discriminatory reason." Shabat v. Blue Cross Blue Shield, 925 F. Supp. 977, 988 (W.D.N.Y. 1996). To prove a discrimination claim, "plaintiff must do more than simply disagree with the defendant's business decisions." Jimoh v. Ernst & Young, 908 F. Supp. 220, 226 (S.D.N.Y. 1995). Plaintiff must proffer evidence that the adverse job actions she complains of were the result of discrimination. Shabat, 925 F. Supp. at 988. On this motion for summary judgment, the defendants must show that there are no issues of material fact that would bar entry of judgment on this issue in their favor, and no inferences to be drawn from the facts in the plaintiff's favor.

Defendants argue that there is no evidence that plaintiff's employment was terminated because of her gender, and the court agrees. They point out, first, that the same individuals who participated in the decision to hire plaintiff in August 2005 (Nyberg and Kusel) also participated in the decision to terminate her employment in December 2006. Where the same individual hires an employee, and within a relatively short span of time thereafter decides to terminate the employee, a strong inference exists that discrimination was not the motivating factor for the termination. See, e.g., Stetson v. Nynex Service Company and Nynex Corp., 1992 U.S. Dist. Lexis 14856, *13 n.3 (S.D.N.Y. Sept. 30, 1992), aff'd, 995 F.2d 355 (2d Cir. 1993). Consideration of the plaintiff's arguments in support of her claim also lead to that conclusion.

As is often the case, the plaintiff here has no direct evidence of a discriminatory motive for her termination, and she must rely on indirect evidence. Thus, she attempts to support her

claims with allegations of behavior that she believes lead to an inference of discrimination sufficient to withstand summary judgment. The allegations, as will be seen, are not directly related to her firing, but, she argues, demonstrate an atmosphere of discrimination from which an inference can be drawn that she was fired because she is a woman. The events complained of are a laundry list of things that Romano found offensive about Nyberg, but they are insufficient to create an issue of material fact as to her discrimination claim or to raise an inference that the adverse employment action - her termination- occurred under circumstances giving rise to an inference of discrimination.

First, the plaintiff compares Nyberg's treatment of her with Nyberg's treatment of Kusel and other, unnamed, male employees, stating that: (1) Nyberg did not subject Kusel, a male employee, to harassment because Nyberg never "looked at Kusel in an inappropriate way or ran her eyes up and down his body," but did do that to Romano; (2)"Nyberg did not discuss her sex life or sex in general with Kusel"; (3)"Nyberg never touched Kusel in an inappropriate way"; (4) "Nyberg did not discuss her sex life with any of Romano's male colleagues"; and (5) "Nyberg did not invite any male employees to the lingerie bridal shower." Pl. Mem. in Opp, DE[29] at 14. Accepting these accusations as true, the behavior complained of does not lead to an inference of discriminatory firing. These allegations are more appropriately considered as things that were allegedly done <u>to</u> Romano to create a hostile work environment, not things that were not done to Kusel or other men in the workplace and thus indicative of gender bias[4]. There is no nexus between the acts and Romano's termination, and no inference to be drawn from them that Romano's termination was gender-based.

[4]As explained *infra,* they also fail to support a finding that material issues of fact exist regarding whether there was a hostile work environment.

Plaintiff also asserts that the following instances constituted gender based discrimination and lead to an inference of discriminatory firing: (1) Fawber "told plaintiff that Nyberg did not take [Fawber] seriously because she is a woman, she has blond hair and her voice is too high"; (2) Nyberg told Fawber "that [Fawber] was not capable of using the right side of her brain and slapped her in the head for asking Mr. Paul Clancy a stupid question"; (3) Fawber's testimony that "it was hard to establish boundaries with Nyberg,"[5] (4) Fawber allegedly told plaintiff that Fawber "believed Nyberg treated [Fawber] differently from her male co-workers and subjected her to inappropriate sexual harassment"; and (5) Fawber spoke to Plaintiff, Byrnes and Kennedy about how Nyberg treats women differently. (Pl.'s 56.1 Statement, ¶¶ 117-20, 130-36, 139). Pl. Mem. in Opp, DE[29] at 12-14. These allegations add nothing to Plaintiff's claim. Even putting aside the hearsay problems inherent in several of these allegations, Romano fails to demonstrate any connection between these alleged incidents and her own claim of gender discrimination, distinct from any complaints Fawber may or may not have had about Nyberg concerning behavior that does not come even close to a level of gender discrimination. Nor do these allegations lead to an inference that the Stora Enso workplace was one in which gender discrimination was present.

---

[5]The plaintiff mischaracterizes Fawber's testimony that "it was hard to establish boundaries with Ms. Nyberg." Romano Dep., p. 14. When McDonald interviewed Fawber in connection with plaintiff's harassment claim, Fawber explained that she and Nyberg had both a professional relationship because Nyberg was her supervisor, and a personal relationship, and at times, it was hard to separate the two. (Fawber Dep. pp. 48-49). The comments in no way contribute to an inference of gender discrimination. As to allegation number (4), Fawber's actual testimony was that she spoke with plaintiff about how Nyberg commented on their attire, not about any alleged disparate treatment. (Fawber Dep. pp. 25-26). Even supposing Fawber felt she was being discriminated against, her speaking to other co-workers, including plaintiff, about such treatment does not somehow mean that plaintiff was discriminated against by association.

Plaintiff also submits that Nyberg "attempted to cause friction between plaintiff and female Enso employees, Kennedy, Fawber and Byrnes." Plaintiff attempts to support this contention with allegations that (1) Kennedy and plaintiff discussed the possibility that Nyberg treated them differently because they are women; (2) Byrnes told plaintiff that she felt like a "battered woman in regard to Nyberg's treatment of her;" (3) Nyberg caused friction between Kennedy and plaintiff in regard to the Verizon account, specifically that "Nyberg liked to stir the pot with female employees." Plaintiff speculates that these actions constitute gender-based discrimination because Nyberg did not "make disparaging remarks or cause friction between Stora Enso's male employees." (Pl.'s 56.1 Statement, ¶¶ 138, 141, 144-49, 151-56). But there is no evidence at all about how Nyberg did or not treat male employees, other than the allegations about Kusel, *supra*. And, these allegations are infused with hearsay and are largely unsupported.

The plaintiff also reports that she believed that Nyberg attempted to cause friction between plaintiff and Fawber, because "[Nyberg] would make comments about [Fawber] to [plaintiff] that [plaintiff] found disparaging and inappropriate. And they would not have been said if [plaintiff] was a man." (Romano Dep. p. 71). Plaintiff, however, provides only one example of a comment that was disparaging, and, by implication, somehow related to her claim of discrimination. Plaintiff testified that Nyberg told her that "Kennedy is a junior rep and you're a senior rep." (Romano Dep. p. 109). Plaintiff contends that Nyberg's comment was disparaging and would not have been made to a male colleague. It is unclear how a comment that was an accurate statement of both employees' positions within the company could be disparaging, and even more unclear as to why such an accurate statement would not have been made to males.

Additional allegations of gender based discrimination include: (1) Romano's being

subjected to an "off-cycle" review in November 2006 after plaintiff filed an internal complaint and had anonymously answered a Sarbanes-Oxley survey in April 2006 and (2) "toe-to-head" observations of Romano by Nyberg and no such observations of male employees. Romano Dep., pp. 12, 16 There is absolutely no reason to think that the plaintiff's review in November 2006 was conducted because she was a female. Plaintiff never alleges that she was the only employee to be reviewed off schedule, or that only female employees were subject to such a review, and there is nothing in plaintiff's having her work reviewed off cycle that demonstrates or even suggests discrimination. Second, while plaintiff states as fact that Nyberg never did a toe-to-head review of male employees, plaintiff testified that she had never actually asked any male employees whether Nyberg commented about their appearances and further stated that there was no reason why she did not inquire. Moreover, plaintiff's female co-workers testified that Nyberg did indeed look at male employees from toe-to-head. (Kennedy Dep. pp. 47-48; Fawber Dep. p. 16).

Plaintiff has not offered any objective evidence showing that her employment was terminated under an inference of discrimination, or that women were treated differently than men in violation of Title VII. Indeed, as noted earlier, Romano's only reference to other employees being fired or demoted or leaving under undesirable circumstances was her reference to four **male** employees in her letter to Mr. Gillen. Instead, plaintiff offers several instances of what she believes was "inappropriate conduct" toward herself and other female employees at Stora Enso and then alleges that the same conduct would not have occurred had she been a male employee. But there is nothing to connect that behavior to Romano's firing - the adverse employment action at issue here. In short, the plaintiff has not made out a prima facie case of discrimination, and I recommend that defendants' motion for summary judgment be granted with

respect to the discrimination claim, both as to the Title VII and NYSHRL claims.                    .

**Defendants' Legitimate, Non-Discriminatory Reason For Plaintiff's Dismissal**

Further, even assuming Plaintiff did establish a *prima facie* case of discrimination, defendants have articulated a legitimate, non-discriminatory business reason for their decision to terminate her employment.  Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 1008 (1988). Specifically, defendants state that plaintiff's employment was terminated because of her unsatisfactory job performance, i.e., failure to develop new business, and to submit a proper plan to improve her performance as directed by Kusel and McDonald on December 4, 2006.

Defendants cite to several federal discrimination cases containing facts similar to the ones at bar.  These cases have held that legitimate, non-discriminatory reasons for discharging an employee can include an employee's inability to bring in new business and failure to develop a plan to improve his or her job performance. See Snyder v. Advest, Inc., 2008 U.S. Dist. Lexis 80862 *10 (S.D.N.Y. October 8, 2008) ("Plaintiff's incapacity to bring in new business is a 'legitimate business reason [ ] for his…termination'."); Mihoubi v. Caribou Coffee Co., Inc., 288 Fed. Appx. 551, 2008 U.S. App. Lexis 14810 *14 (11th Cir. July 9, 2008) (Plaintiff failed to rebut defendant's legitimate nondiscriminatory reason for his termination that his business plan was deficient.  "To establish pretext, [plaintiff] needed to present evidence that he produced a business plan that met [defendant's] purposes but that [defendant] rejected the business plan for discriminatory reasons.")

Defendants argue that they have provided a legitimate, non-discriminatory business reason for Plaintiff's termination and that Plaintiff has not showed that their proffered reason is a mere pretext for discrimination.  Burdine, 450 U.S. at 253.  In determining whether the plaintiff has met this burden, the court's responsibility is to examine the entire record to determine

whether the plaintiff satisfied her ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff. Schnabel v. Abramson, 232 F.3d 83,

90 (2d Cir. 2000). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) ("[A]

reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason

was false, and that discrimination was the real reason.").

In the instant case, plaintiff has not presented any evidence that defendants' legitimate

business reason was a pretext for discrimination. Defendants specifically point out that when

defendant Nyberg spoke with plaintiff about the fact that she was spending too much time with

one account and the need for plaintiff to develop new business, Plaintiff acknowledged that she

had indeed spent too much time on the one account. (Pl. Dep., pp.261-62; see Windholz

Affidavit, Exhibit "J").

Because the defendants have set forth a legitimate, non-discriminatory business reason

for Romano's termination, and the plaintiff has failed to raise an issue of material fact suggesting

that the reason is a pretext, her claim must fail. No reasonable finder of fact could find, on the

record before the court, that Romano's firing was discriminatory based on gender.

**Plaintiff's Sexual Harassment and Hostile Work Environment Claims**

In addition to claiming that she was fired as a result of gender discrimination, the

plaintiff also alleges that she was subjected to a hostile work environment in the form of sexual

harassment by her supervisor, Nyberg, in violation of Title VII and the New York State Human

Rights Law ("NYSHRL"). In support of that claim, she relies on some of the same factual

allegations discussed *supra* in regard to her termination claim, along with other factual

assertions. Those factual allegations demonstrate that Romano did not like Nyberg and may

have felt uncomfortable in the workplace as a result of Nyberg's behavior, but they do not rise to

30

the level of a hostile work environment. Title VII and the NYSHRL were not intended to sterilize employee relations or to create a generalized code of workplace civility. See Lucas v. South Nassau Communities Hosp., 54 F. Supp. 2d 141, 147 (E.D.N.Y. 1998). As such, work-related conduct that may be described as "immature, nasty, or annoying, without more, is not actionable as sexual harassment." [6] Nolan v. Epifanio, 1998 U.S. Dist. Lexis 15139, *10 (S.D.N.Y. Sept. 28, 1998).

In distinguishing between lawful conduct which is merely boorish and offensive, and illegal conduct, the courts consider the following non-exhaustive list of factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or merely an offensive utterance; (4) whether the conduct unreasonably interfered with an employee's work performance; and (5) what psychological harm, if any, resulted. Harris v. Forklift Sys., 510 U.S. 17, 23 (1995). The plaintiff must subjectively perceive the work environment to be abusive, but the plaintiff's perception does not establish abuse. Instead, the severity of the conduct must be judged objectively, from the perspective of a reasonable person in the plaintiff's position. Id. 21-22; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Assuming for the purposes of this Report that Romano subjectively perceived the work environment to be hostile, I find that the events complained of are not objectively severe for Title VII purposes.

Plaintiff bases her sexual harassment/hostile work environment claim primarily upon the following five incidents: (1) Nyberg looked at her from toe to head (gave her the "once over")

---

[6] I do not suggest that Nyberg's behavior was, or was not, any of these things, but find that it did not amount to sexual harassment or create a hostile work environment, despite Romano's beliefs to the contrary.

and commented about her attire and hair; (2) on one occasion Nyberg touched plaintiff's hair and said it looked good and on another occasion touched the arm of plaintiff's jacket and also commented favorably; (3) Nyberg allegedly directed plaintiff to think of Nyberg as a "man trapped in a woman's body"; (4) Nyberg advised plaintiff that she and her husband had a "date night"; and (5) Nyberg held a bridal lingerie party for one of plaintiff's female co-workers and did not invite any of the male employees.

The court first notes that this is a same-sex harassment claim. In cases alleging opposite gender sexual harassment, the plaintiff may take advantage of certain inferences which are unavailable to a plaintiff alleging same-sex harassment. In cases of explicit or implicit sexual proposals or physical conduct, there is a presumption that the proposal would not have been made to someone of the same gender. This presumption may not be available in cases of same-sex harassment, however. A plaintiff can prevail in a same-sex sexual harassment case if she presents: (1) evidence that the harasser was homosexual and the harassment was motivated by sexual desire; (2) evidence that the harasser was motivated by a hostility to the presence of the plaintiff's sex in the workplace; or (3) evidence that the harasser treated men and women differently. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. at 80-81.

Plaintiff has failed to offer evidence that raises a question of fact as to any of the three Oncale elements. First, there is no basis for believing that Nyberg is homosexual. Plaintiff testified at her deposition that she did not know whether Nyberg was homosexual, although she suggested at her deposition that Nyberg may be homosexual because (1) Nyberg commented to plaintiff that Romano should think of Nyberg as a "man trapped in a woman's body," and (2) Nyberg only invited female employees to the lingerie bridal party held for a co-worker. (Romano Dep., pp.57-59). Neither of these allegations raises the slightest question about

Nyberg's sexual orientation, and the court need not consider that element further.

As to the five incidents allegedly amounting to harassment, they are, as a matter of law, not frequent, not severe, not physically threatening or humiliating, and did not interfere with Romano's job performance. There is no evidence suggesting that Nyberg's alleged harassment was motivated by hostility towards females so as to raise an issue of material fact in that regard. Nor is there evidence sufficient to support the claim that Nyberg treated men and women differently in violation of Title VII.

The defendants argue that the conduct that the plaintiff attributes to Nyberg, for example., head-to-toe review, isolated positive comments about plaintiff's hair and suit jacket, discussions regarding Nyberg's "date night" with her husband and the bridal lingerie party for a female co-worker, were not sexually based, but were gender neutral under Title VII analyses, and the court agrees. Cases in which the defendants engaged in similar behavior have led to the same conclusion. In <u>Soliman v. Deutsche Bank</u>, No. 03 Civ. 104, 2004 U.S. Dist. Lexis 9087 (S.D.N.Y. May 20, 2004), the plaintiff alleged that his superior treated him favorably, touched his arm, touched his shoulders in meetings when describing their relationship as "close, sat close to plaintiff, commented that plaintiff was a "good looking guy," told plaintiff that he was gay and invited plaintiff to social events, including a gay bar. The court found that "[n]one of these acts are marked by any hint of sexual innuendo, nor do they suggest that Pletzinger's conduct was motivated by animus against males in the workplace. A reasonable jury could not conclude that Pletzinger's neutral acts were motivated by Soliman's sex." 2004 U.S. Dist. Lexis 9087 at *32. In <u>Moran v. Fashion Inst. of Technology</u>, 2002 U.S. Dist. Lexis 19387 (S.D.N.Y. Oct. 7, 2002), the Court also found that the harasser's alleged behavior was facially neutral, where the plaintiff alleged that his supervisor watched him closely and stared at him "wide-eyed"; lingered

close to his chair and touched his arm and/or shoulder for long periods while speaking to him; complimented his appearance and demeanor; and shared his impressions of other employees. Id. at *18. Moran interpreted his supervisor's behavior as indicators of sexual interest in him, but the court disagreed, finding that he had not met his burden of establishing a genuine issue of material fact that his supervisor's behavior toward him was based on his sex. Moran did not present any evidence that his supervisor was homosexual. Moreover, the court found that even if Moran could support a claim that his supervisor was homosexual, his conduct was facially neutral – "excessive attention, physical proximity, or touching a person briefly in conversation is not inherently sexual." Id.

Here, as in Moran and Soliman, plaintiff has not established a genuine issue of material fact that Nyberg's alleged conduct was motivated by plaintiff's sex or was the result of Nyberg's being homosexual. Indeed, the events complained of by plaintiff - Nyberg sitting too close to her at an industry convention, touching and commenting favorably on plaintiff's hair and suit jacket, inviting plaintiff and her other female co-workers to a lingerie bridal shower for a co-worker, talking about "date night" with her husband and isolated toe-to-head reviews - all constitute facially neutral conduct for Title VII purposes. Plaintiff has not provided any evidence showing that Nyberg undertook these isolated events because plaintiff is a female.

Further, even if the comments and conduct at issue could be considered sexual or gender-based, when viewed objectively, they do not rise to the level of severity or pervasiveness necessary to support an actionable claim of sexual harassment. There is no "mathematically precise test" to determine whether conduct is sufficiently pervasive to create a hostile work environment. Harris, 510 U.S. at 22-23. Rather, a determination of whether the alleged conduct meets the threshold of severity or pervasiveness is a determination that must be based on the

"totality of the circumstances." Harris, 510 U.S. at 23; Crawford v. New York Life Ins. Co., 2006 U.S. Dist. Lexis 69585, *29 (E.D.N.Y. Sept. 27, 2006). Plaintiff argues that the Second Circuit "has repeatedly cautioned against setting the bar too high" for establishing a hostile work environment. Feingold v. NewYork, 366 F.3d 138, 150 (2d Cir 2004). However,"[c]asual comments, or accidental or sporadic conversation will not trigger equitable relief under the law." Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986); see also Kotcher v. Rosa and Sullivan Appliance Ctr., 957 F.2d 59, 62 (2d. Cir. 1992). Instead, to be actionable, defendants' conduct must have been so severe and pervasive as to create a "poisoned" atmosphere in which the employee "must'run a gauntlet of sexual abuse" in order to perform her job. Christoforou v. Ryder Truck Rental, Inc., 668 F. Supp. 294, 301 (S.D.N.Y. 1987)(internal quotation marks omitted). Based on these standards, plaintiff's claims of hostile work environment in the form of sexual harassment fail as a matter of law because the alleged incidents were not sufficiently severe or pervasive under Title VII.

Indeed, courts have dismissed claims of sexual harassment based on incidents more egregious than those alleged by plaintiff. See, e.g., Grossman v. The Gap, Inc., 1998 U.S. Dist. Lexis 3626 (S.D.N.Y. Mar. 24, 1998) (no reasonable juror could find defendants' conduct subjected plaintiff to discrimination where plaintiff was asked out on dates, asked to model a bathing suit and subjected to one rude, demeaning comment); Gonzalez v. Kahan, 1996 U.S. Dist. Lexis 22715 (E.D.N.Y. Nov. 25, 1996) (obscene phone call, bear hug, marriage proposal and several requests for dates held insufficient to establish hostile work environment). Even the cases cited to by plaintiff involved conduct more egregious than that at issue here. *See, e.g.,* Holtz, 258 F.3d at 75-76( triable issue of fact where, during more than one year of employment, harasser touched plaintiff's hand on a "daily basis," made "obscene leers at her," "tried to peer

down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life; Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001)(triable issue of fact where plaintiff, over two and a half years, was subjected to offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage and one serious threat of physical harm); Torres v. Pisano, 116 F.3d 625, 628-33 (2d Cir.1997) (finding hostile work environment where defendant-supervisor repeatedly called plaintiff obscene names, suggested she performed oral sex for money, ridiculed her pregnancy, commented on her anatomy and his desire to have sex with her, and allowed his friends to make crude sexual remarks about her).

In all of the cases cited to by plaintiff, the conduct exhibited was found to be severe or pervasive enough to create an objectively hostile work environment.  The conduct complained of by plaintiff herein does not come close to the severity of the behavior in those cases, and there is no issue of material fact to bar entry of summary judgment in favor of the defendants on that claim, both under the federal and the state law.

### Plaintiff's Retaliation Claim

Plaintiff's last claim is that of retaliation under Title VII and the NYSHRL  Under those statutes, an employer is prohibited from firing an employee in retaliation for having made a charge of discrimination.  42 U.S.C. § 2000e-3(a); N.Y. Exec. Law § 296(1)(e).  A claim for retaliation under the NYSHRL is generally governed by the same standards as Federal claims under Title VII.  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006). Title VII is violated when a retaliatory motive plays a part in an adverse employment action toward an employee.  Thus, a retaliatory motive need not be the sole cause of plaintiff's termination.  Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).

The Court evaluates a Title VII retaliation claim under the McDonnell Douglas three-

step, burden-shifting framework. First, a plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she participated in an activity protected under Title VII; (2) the employer was aware of her participation in the protected activity; (3) the employer took adverse action against her based on her protected activity; and (4) there was a causal connection between the protected activity and the adverse action taken by the employer. Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006); McMenemy v. City of Rochester, 241 F.3d 279, 282 (2d Cir. 2001). The "protected activity" element of a retaliation case turns upon whether the employee has protested an "unlawful employment practice," within the meaning of Title VII. Wimmer v. Suffolk Co. Police Dep't, 176 F.3d 125, 134-35, (2d Cir. 1999). The practice complained of need not necessarily be illegal under Title VII. Rather, a cause of action may exist so long as plaintiff possessed a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Manohoran v. Columbia College of Physicians and Surgeons, 842 F.2d 590, 593 (2d Cir. 1998).

In determining whether a plaintiff has met the initial burden of establishing a prima facie case, the court's role on a motion for summary judgment is "'to determine only whether the proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" McIntryre v. Longwood Central School District, 2009 WL 3113261, *8 (E.D.N.Y. Sept. 30, 2009)(quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

Here, Plaintiff alleges that on four occasions she complained about Nyberg and that those complaints were protected activities under Title VII: (1) during a team meeting in December 2005; (2) during a meeting with Nyberg in January 2006; (3) in an anonymous Sarbanes-Oxley survey; and (4) in a letter to the President of Stora Enso, John Gillen.

The December 2005 Meeting: Plaintiff contends, first, that her complaint to Nyberg on December 16, 2005 about the number of meetings and conference calls she was required to attend prompted Nyberg to retaliate against her. As noted earlier, a plaintiff claiming retaliation must show that she reasonably believed that the conduct complained of was unlawful. Plaintiff cannot in good faith argue that she reasonably believed that Nyberg's practice of holding too many meetings was illegal and the complaint made at the December 2005 meeting cannot constitute the basis of a Title VII retaliation claim.

The January 2006 Meeting: Plaintiff testified that in January 2006, she advised Nyberg that "she treats the women differently from the men," but failed to provide Nyberg with any examples of the alleged disparate treatment.[7] Romano Dep. p. 120. Plaintiff claims that in response to her allegation, Nyberg directed plaintiff to think of her as a "man trapped in a woman's body" in order to make communication between each other easier. Romano Dep. p. 120. Romano also claims that, at the January 2006 meeting, she asked Nyberg to stop being sarcastic in e-mails and to cease doing "once-overs." Plaintiff stated that Nyberg was visibly angry and was saying "quite loud" to think of Nyberg as a woman trapped in a man's body. Romano Dep., pp.117-18. Plaintiff believes Nyberg made this comment in retaliation for complaining. However, even assuming that Nyberg made such statements to plaintiff, "quite loud[ly]" or not, they are not retaliatory adverse employment actions covered by Title VII. See Schiano, 445 F.3d at 604 (tangible employment action usually constitutes significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

---

[7] Defendants indicate that plaintiff's deposition testimony differs from the allegations in her Complaint, where she alleges that Nyberg advised her that she was treating her differently because she complained about unequal treatment compared to her similarly situated male co-workers and voiced her professional opinion in an earlier meeting. Complaint, ¶105.

different responsibilities, or decision causing a significant change in benefits).

Plaintiff argues that after her meeting with Nyberg, her job duties changed. Plaintiff is correct, her job duties did change - they changed for the better. After the meeting, Nyberg allowed plaintiff to handle the Verizon account, which plaintiff herself had requested and which at that time was assigned to Kennedy. In addition, plaintiff received a $3,570 raise between January 2006 and November 2006, as well as a $4,325 bonus in April 2006. Romano Dep. pp. 124-29. These actions are not adverse employment actions, as required under Title VII. Thus, even assuming that plaintiff engaged in protected activity by complaining at her January 2006 meeting, she did not suffer an adverse employment action in response to the activity. As such, plaintiff's January 2006 meeting does not form a basis for a retaliation claim under Title VII.

The Sarbanes-Oxley Survey: Plaintiff testified that she completed a Sarbanes-Oxley ("SOX") survey in April 2006, in which she allegedly complained about gender discrimination and sexual harassment in the northeast region of Stora Enso. Romano Dep., pp.91-92. While plaintiff refused to admit that the survey was completed anonymously and submitted by the employees via a third-party vendor, she did acknowledge that she did not sign her name on the survey. Romano Dep., pp.92-94; Def. Ex. A. In addition, when plaintiff was presented with a copy of the SOX survey responses, she could not locate her alleged comments. (Romano Dep. p. 95). Thus, plaintiff has not provided any evidence indicating that she made such statements or that Nyberg knew about plaintiff's activity. Therefore, plaintiff's SOX survey cannot serve as a basis for a Title VII retaliation claim.

The November 2006 Letter to Gillen: The parties dispute whether the letter to Mr. Gillen constituted protected activity. Plaintiff claims that her letter to Gillen constituted protected activity and that defendants were put on notice of such activity. Pl.'s 56.1 Stmt, ¶¶200-201.

The defendants argue that the vague assertions of misconduct in the letter cannot be characterized as expressions of statutorily protected activity as a matter of law.  It is true that Plaintiff's letter to Gillen constituted a comprehensive list of grievances against Nyberg and  her management techniques and did not expressly allege that Romano was a victim of gender discrimination or sexual harassment.  In fact, plaintiff specifically states that both male and female colleagues were subject to similar treatment.  Nonetheless, Doreen McDonald, who investigated the complaints, stated in her letter to Romano dated December 13, 2006 that Stora Enso's Human Resources department had investigated the complaints, and described Romano's letter as having raised "concerns of gender discrimination toward females in the North East Region."  Def. Ex. Q.  Thus, the letter must be considered protected activity of which the employer was aware, and the court turns next to the question of whether there are material issues of fact as to the causation element.

A causal connection may be established directly through evidence of retaliatory animus against plaintiff by defendants or indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.  Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991).  An inference of causation is defeated: (1) if the allegedly retaliatory action took place a sufficiently distant time after the protected activity; or (2) if there was an "intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005).  A plaintiff is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors."  Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d

Cir. 1995).

Romano has not submitted any direct evidence of retaliation against her or of favorable treatment of other employees whose performance was unsatisfactory. She has demonstrated temporal proximity between her November 26 letter and her December 13 termination, but the temporal proximity is the <u>only</u> evidence of retaliatory animus, and it is not sufficient to withstand summary judgment. While proximity in time may suffice to establish causation, where, as here, "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir.2001). The parties agree that discussions regarding plaintiff's unsatisfactory job performance and her continued employment with the corporate defendant began before plaintiff wrote her letter to Mr. Gillen. Under those circumstances, temporal proximity is not enoug. <u>See Nielsen v. New York City Dep't of Educ.</u>, 2009 U.S. Dist. Lexis 8866 (E.D.N.Y. Feb. 4, 2009)(no causation where instructions for job improvement in evaluations that formed basis of termination given to plaintiff before he made complaint); <u>Rothenberger v. New York City Police Dep't</u>, 2008 WL 2435563 (E.D.N.Y. June 16, 2008) (retaliation claim dismissed where plaintiff received "below standards" evaluations before he filed his EEOC charge). Plaintiff was first told on November 14, 2006 that her job was not having a positive impact on the metro market and that she was not developing new business as required by her position. She was also informed that she was spending too much time on the Verizon account, which she later agreed was an accurate statement. Moreover, on November 20, 2006, McDonald and Nyberg discussed the possibility that if plaintiff refused to perform the tasks assigned to her, then it would be time to consider terminating plaintiff's employment. The plaintiff admitted that she first became

worried that job was in jeopardy on November 21, 2009, when Nyberg left her a voice message to attend a meeting that was originally scheduled for November 29, 2006. Indeed, Romano herself testified that she called the Employee Hotline on November 22 because she was afraid she would be fired. Pl. 56.1 Stmt. ¶¶32-34; Complaint, ¶200; Romano Dep., pp. 169-70, 188.

Thus, the defendants had made clear to Romano that her job was at serious risk if she could not come up with a plan for improvement, and, in their opinion, she did not do so. As noted earlier, the defendants have established, and the plaintiff has not successfully contested, that the termination decision was a non-discriminatory, non-pretextual business decision. Surely the discrimination law cannot require that all an employee who sees the handwriting on the wall and fears firing needs to do to insure a federal trial is to complain of discriminatory behavior before the axe falls. Here, there is no evidence[8] whatsoever of retaliatory animus other than temporal proximity, and, under the totality of the circumstances of this case, that is not enough.

The plaintiff has not come forward with evidence, direct or indirect, to raise a question of material fact as to the causal connection between the protected activity and her termination and has thus not established a prima facie case of retaliation. The evidence she has proffered would be insufficient "to permit a rational finder of fact to infer a retaliatory motive," and the retaliation claim must be dismissed, under both federal and state law. See McIntyre v.

---

[8]Plaintiff argues that at her December 4, 2006 meeting, she was read a memo that stated that her performance was deficient, and she concludes that this is "direct evidence of Defendants' retaliatory animus and proves Defendants' reason [for her termination] is pretextual." Pl. 56.1 Stmt, ¶ 238; Pl. Mem. in Opp. p. 21. However, Plaintiff had been directed, on November 14, 2006, to develop a plan for how to make her position have a better impact on the metro market and she cannot reasonably argue that being told on December 4, 2006 that her performance was deficient because the plan she submitted was not satisfactory indicates Kusel's discriminatory state of mind.

Longwood Central School District, 2009 WL 3113261, *8 (E.D.N.Y. Sept. 30, 2009).

## OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. §636 (b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a) and 6(d). Failure to file objections within this period waives the right to appeal the District Court's Order. See Ferrer v. Woliver, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); Beverly v. Walker, 118 F.3d 900, 902 (2d Cir. 1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
February 12, 2010

 /s/ William D. Wall
WILLIAM D. WALL
United States Magistrate Judge